TRADERS GRAIN COMPANY et al., Appellees, v. CAVERS ELEVATOR COMPANY et al., Appellants.

**TROVER AND CONVERSION: Title in Plaintiff—Evidence.** Evidence reviewed, and held to show that plaintiff, suing for the conversion of grain, never had any title thereto.

**TROVER AND CONVERSION: Title in Plaintiff—Evidence—Good Faith.** Evidence reviewed, and held to show that plaintiff, suing for the conversion of corn, was not the real party in interest.

*Appeal from Pottawattamie District Court.*—HON. E. B. WOODRUFF, Judge.

WEDNESDAY, MARCH 10, 1915.

REHEARING DENIED TUESDAY, OCTOBER 5, 1915.

THIS action was originally commenced by the Traders Grain Company against the defendants to recover damages for the conversion of certain corn which had been consigned to it. Having assigned their cause of action to H. F. Finks, he was substituted as plaintiff. The defendants denied the conversion and alleged that they took the grain under an attachment in a suit by the Cavers Elevator Company against one W. H. Hurley, who, they allege, was the owner of the grain. At the conclusion of the testimony, the trial court directed a verdict against the defendants for the value of the corn, and defendants appeal.—*Reversed.*

*McKenzie & Cox,* for appellant.

*Saunders & Stuart,* for appellee.

DEEMER, C. J.—I. At the request of the Weekes Grain Company, of Omaha, Nebraska, defendant, Cavers Elevator Company, on April 26, 1909, billed two cars of corn to St. Louis, Mo., the same being consigned to the order of the Cavers Company, with instructions to notify Traders Grain Company, of St. Louis. Bills of lading to the order of the Cavers Elevator Company were issued by the railway company, and these were endorsed by the elevator company in blank and delivered to the Weekes Grain Company; and the Weekes Company, on the same day, drew a draft on W. H. Hurley of Clinton, Mo., for the sum of $1,450, representing the purchase price of the grain. The draft was attached to the bills of lading and deposited with Merchants National Bank of Omaha, Nebr., for collection. These papers were forwarded to the Clinton National Bank of Clinton, Mo., for collection, the draft being endorsed in blank by the Merchants Bank.

On the morning of April 28, 1909, the draft, with bills of lading attached, reached Clinton, Mo.; and, pursuant to an arrangement between Hurley and H. F. Finks, he (Finks) took up the draft, giving his own check therefor to the Clinton Bank, at the same time giving Hurley a check for $81.14, representing Hurley's profit on the corn. Finks, at the same time, drew a draft on the Traders Grain Company, attached the same to the bills of lading and forwarded the same to a bank in St. Louis for collection. This draft was for $1,550. Before the draft was presented to the Traders Grain Company at St. Louis, that company was advised that the two cars of corn had been attached at Council Bluffs by the Cavers Elevator Company in an action by it against W. H. Hurley, and the Traders Grain Company refused to pay the draft.

An agent of the Traders Company then went to Council Bluffs and secured the release of the cars, upon condition that he allow the constable having the writ of attachment to take out 250 bushels of the corn, which the constable retained to satisfy whatever judgment might be obtained in the attachment proceedings. Upon the return of this agent to St. Louis, the Traders Company made arrangements with Finks to deduct the sum of $150 from the draft drawn upon it by Finks, it being the agreed value of the corn taken from the cars, and the Traders Grain Company paid $1,400 in full settlement of the draft drawn upon it by Finks. This action was then brought by the Traders Grain Company to recover the value of the corn and other damages.

After the suit was brought, the grain company assigned its cause of action against the defendants to Finks, and he was substituted as plaintiff. In the original petition, the grain company alleged that it was the owner of the 250 bushels of corn and that the same was unlawfully, wrongfully, and maliciously taken by the defendants upon an attachment issued against one W. H. Hurley. Defendants admitted the issuing out of the attachment, pleaded that Hurley was the owner of the grain, and that the transactions between him and

Finks with reference to the grain were fraudulent and a part of a scheme to defraud the defendant elevator company; that Finks never in fact owned the grain and that it was the property of Hurley until after the attachment was issued, and that Finks had knowledge or notice of the attachment at the time he made the arrangements with Hurley.

Finks, the substituted plaintiff, pleaded his assignment from the Traders Grain Company of its cause of action and claim for damages, and upon these issues the case was tried.

II. Whilst many questions are made in argument, the issues are comparatively simple; and it is manifest that neither the Traders Grain Company nor its assignee, Finks,

1. TROVER AND CONVERSION: title in plaintiff: evidence.

can recover in this action without showing that the grain company became the owner of the 250 bushels of corn in controversy and was entitled to the value thereof when this action was commenced. The action was not commenced by Finks in his own behalf, nor was it prosecuted by reason of Finks' independent ownership of the grain. Whatever rights he has thereto are in virtue of his assignment from the Traders Grain Company. Moreover, if Finks were making any claim on his own behalf or from and through Hurley, the question of the fraudulent character of the transfer from Hurley to Finks is involved, and also the issue as to whether or not there ever was any sale in fact of the grain by Hurley to Finks. Another possible issue upon which we have no light in this record is the priority of the attachment over the transfer of the bills of lading from Hurley to Finks. Upon the first proposition—the ownership of the corn in controversy—it clearly appears from the record that the Traders Grain Company never paid for this 250 bushels of corn.

Finks testified:

"Drafts with bills of lading attached were delivered to me. After purchasing the cars, I drew a draft on Traders Grain Company for $1,550, and attached bill of lading to the

draft, and sent it to St. Louis for collection. (Witness identi-
fies Exhibit 1 as draft I drew on Traders Grain Company,
St. Louis, for $1,550.) This draft had attached to it two
bills of lading. Q. I will ask you whether or not this draft
was paid? A. The draft was paid after reducing it to
$1,400. Q. State why this was reduced from $1,550 to $1,400.
A. On account of 250 bushels being taken out of the car at
Council Bluffs. I never got any pay for the 250 bushels that
were taken out. There were 250 bushels taken out. They
were taken out on account of an attachment in the case of
Cavers Elevator Company v. W. H. Hurley. Q. Did they
pay you the contract price for the two cars, less 250 bushels
taken out? A. Yes, sir. Q. Then they are interested in this
250 bushels of corn? A. No, sir; they have no interest in the
outcome of this litigation.''

Hurley testified in part as follows:

''Q. Are you under any obligations for any of the ex-
penses of this suit? A. I am not, except as to the 250 bushels
of corn which, under the terms of my contract, I was to accept
destination weight, and inasmuch as the 250 bushels were not
delivered, I have failed up to that extent in delivering the
amount of corn contracted for. Q. And under what obliga-
tions are you as to the 250 bushels of corn to him? A. I
settled with Mr. Finks for the shortage in weight on that car
of corn, and the understanding in the agreement between Mr.
Finks and I is that if he recovers in this suit he will pay me
for the 250 bushels. If he loses I will get nothing for the
250 bushels of corn. Q. To that extent you are interested in
the outcome of this suit? A. I am looking to Mr. Finks for
that. Q. But if the suit is successful, you are 250 bushels
ahead? A. No, sir. I will not be any corn ahead. I will
have the amount I paid him for the shortage refunded to me.
To that extent I am interested.''

The president of the Traders Grain Company testified:

"The draft was presented to the Traders Grain Company and was accepted but not paid. Thinking the draft a little high, the writer asked for a reduction of $150 on same, and it was granted, and the Traders Grain Company honored that draft for $1,400 on these two cars. I first learned that the two cars were attached from a telegram of Cavers Elevator Company advising me not to accept or honor a draft from W. H. Hurley on these two cars. I do not remember the date of the telegram. I did not answer the telegram. I didn't take any action until I had notice from the bank that they had a draft for H. F. Finks of Clinton, Mo., for a certain amount. That was after I learned that the cars were attached. I brought this suit for H. F. Finks, at his request. Q. You did not pay Mr. Finks for the 250 bushels that was taken out of the car? A. I did not. I paid him only for actual St. Louis weight."

From this testimony, it is clear that the Traders Grain Company never had any interest in or paid for the grain in controversy, and that for this reason alone the trial court was in error in directing a verdict for the plaintiff.

III. Moreover, even if Finks might be said to have been entitled to recover in his own right, in virtue of his paying the draft drawn on Hurley, the question yet remained as to the nature and character of his ownership. We here quote some of the record on this issue.

2. TROVER AND CONVERSION: title in plaintiff: evidence: good faith.

Finks testified:

"I purchased the two cars April 28, 1909. At that time I was bookkeeper at Clinton National Bank. I don't remember my salary at that time. I now draw a salary of $75 monthly. I was not dealing in grain at that time. I never dealt in it before. Have not dealt in it very much since. The four cars of corn I bought from Mr. Hurley at that time

is the extent of my speculation in grain. I saw a chance to make a little money on the side and took advantage of it. I don't remember what my balance in the bank was at that time. I had sufficient to cover the four cars. Mr. W. H. Hurley does his banking business at the bank of which I am bookkeeper. He did his business there at that time. Mr. Hurley approached me on the morning of April 28th. He said he would like to sell me four cars of corn for 66c a bushel. I had never talked to Hurley prior to that time about buying grain. The two cars of corn were billed to the Traders Grain Company at the time I bought them. I have had correspondence with the Traders Grain Company concerning these cars, but I do not have this correspondence. I don't remember whether I had a talk with Mr. Hurley before or after I wrote letter to the Traders Grain Company about the attachment. I wrote the Cavers Elevator Company the next day after I learned from the Traders Grain Company of the attachment. I got the two bills of lading from the Clinton National Bank of which I was bookkeeper at the time. I have not received any pay for the 250 bushels taken out. I made something like $60 on the two cars. Q. Has Mr. Hurley or anyone made good to you, or agreed to stand back of it? A. Mr. Hurley agreed when I bought the corn to protect me against loss. Mr. Hurley sold it to me with the understanding that if I made anything on it, it was mine, and if I lost any money on it, it was his. Q. Has Mr. Hurley agreed to reimburse you in any way in case of loss in this suit? A. He has agreed to protect me from loss. Q. As a matter of fact then, Mr. Finks, isn't it true that Mr. Hurley is the real party in interest in this suit for damages? A. No, sir."

Hurley testified:

"I sold this corn, together with two other cars, to H. F. Finks of Clinton, Mo., and as terms of the contract it was understood and agreed that Mr. Finks was to take up the

Weekes Grain & Live Stock Company's draft on me for four cars of corn designated by me and pay the drafts and any balance that there may be due me over and above these drafts as shown by the invoice was to be paid to me. In pursuance of this agreement, Mr. Finks paid the draft. The Traders Grain Company notified me by long distance telephone from St. Louis in the evening of April 29th that the cars had been attached. I immediately wrote Traders Grain Company that the corn did not belong to me. I told him over the 'phone that the corn did not belong to me. But I wrote him that I had sold the corn to H. F. Finks, Clinton, Missouri. I told Mr. Finks about it the next morning. I had already written Cavers. Q. Mr. Hurley, how did it come about that you sold this grain to Mr. Finks? A. Well, through a difficulty I was having with Cavers. Mr. Cavers was threatening me and I did not know what he intended to do, but I was afraid he was going to cause me trouble and I thought the best thing was to dispose of my corn and get it off my hands as quickly as possible. I went to Mr. Finks and said: 'Harry, I want to sell you four cars of corn; I will sell it to you low, worth the money, and will make you a little profit.' After some talk about this matter he agreed to purchase the corn on my guarantee that the purchase would not make him any loss. The sale was made in good faith and was a bona fide sale, he to receive the profits whatever they were above the price he paid me, and I had no further interest in the corn. Q. I will ask you if you were to guarantee he was to sustain no loss? A. Yes, sir. Q. What was your object in turning the grain over to him? A. To make a profit if he could. Q. If you guaranteed to him to sustain no loss in the purchase, but he should have the profits if there be any, what inducement was there in turning it over to him? A. I had a profit in the corn as it was and was perfectly willing to take the price. I showed Mr. Finks what the market price was in St. Louis and showed him what the cost of getting it to St. Louis would be, and that in the event of sudden decline he would make at

least one cent a bushel profit, and the market was advancing every day, and he finally understood that the purchase would make him a good profit. Q. What interest had you in Mr. Finks to make him a profit, when it did not stand you in hand to make anything on the deal? A. I was making a profit as it was, and was perfectly satisfied that someone else make a profit. I guaranteed that he should sustain no loss. I was expecting the market to go up. In that event I would not lose and I had consigned and would have had to take the market as it was. I wanted to get rid of the grain on account of the trouble between me and the Cavers Elevator Company. I told Mr. Finks the market was strong and the indications were it would continue to advance and to induce him to buy the corn I said I would guarantee him any decline in the market that would run him into a loss."

So it will be seen that the real party in interest in this suit is W. H. Hurley, and a jury would have been authorized to find that there never was any bona fide sale of the corn by Hurley to Finks. On the whole record, it appears that the trial court was in error in directing a verdict in plaintiff's favor, and the judgment must be, and it is—*Reversed*.

LADD, WEAVER and EVANS, JJ., concur.